IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 2, 2020

## IN RE ARYANA S.

**Appeal from the Circuit Court for Meigs County**
**No. 2018-AD-2      Michael S. Pemberton, Judge**

_____

### No. E2019-01267-COA-R3-PT

_____

Lacy B. and Quentin B. (collectively, "Petitioners") filed a petition for adoption and to terminate the parental rights of the mother, Morgan S. ("Mother"), to the minor child, Aryana S. ("the Child"). The Trial Court found that Petitioners had proven by clear and convincing evidence that the grounds of abandonment by failure to support and severe child abuse existed for termination of Mother's parental rights but that termination of her rights was not in the Child's best interest. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed as Modified; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and CARMA DENNIS MCGEE, JJ., joined.

Wencke West, Cleveland, Tennessee, for the appellants, Quentin B. and Lacy B.

J. Patrick Henry, Kingston, Tennessee, for the appellee, Morgan S.

### OPINION

### Background

While Mother was pregnant with the Child, she tested positive for illegal drugs on several occasions. Specifically, Mother tested positive in May 2016 for methamphetamine, amphetamines, and THC. In June 2016, Mother tested positive for amphetamines and THC. Mother had a prenatal appointment with her doctor in June 2016, wherein they discussed concerns of Mother's illegal drug use. Thereafter, Mother

tested positive for methamphetamine in September 2016. In January 2017, Mother tested positive for THC.

The Child was born in January 2017. Following her birth, the Child tested positive on a meconium drug test for THC. While at the hospital, Mother used methamphetamine and was breastfeeding the Child. Mother subsequently tested positive on a drug screen for methamphetamine. The Child began experiencing withdrawal symptoms, was diagnosed with Neonatal Abstinence Syndrome, and was transferred to the Neonatal Intensive Care Unit at the University of Tennessee Medical Center.

Upon the Child's release from the hospital, the McMinn County Juvenile Court ("Juvenile Court") removed the Child from Mother's custody and placed the Child in the custody of Lacy B. ("Great Aunt"). Mother's contact with the Child was to be supervised. An adjudicatory hearing was held in March 2017, and Mother waived her right to an adjudicatory hearing and stipulated to the facts in the petition as being true, which included Mother's failed drug tests during her pregnancy, her drug use at the hospital while breastfeeding, and the Child's withdrawal symptoms and diagnosis of Neonatal Abstinence Syndrome. The Juvenile Court, therefore, found that the Child was dependent and neglected. Based on those same facts, the Juvenile Court found that Mother had severely abused the Child.

In January 2017, DCS developed a non-custodial permanency plan with Mother, which required Mother to complete mental health treatment for manic depressive bipolar disorder and anxiety, complete an alcohol and drug assessment and follow all recommendations, comply with random drug testing and pill counts, not associate with any known drug users or dealers, obtain and maintain stable housing, obtain and maintain a legal source of income, cooperate with DCS and other service providers, maintain regular visitation with the Child, financially support the Child, comply with all court orders, comply with the rules and regulations of DCS and the laws of Tennessee, and comply with these requirements in an expeditious manner. In its March 2017 adjudicatory hearing order, the Juvenile Court found that the requirements for Mother in the proposed permanency plan were reasonably related to the conditions necessitating removal and were in the Child's best interest. The Juvenile Court ordered that custody of the Child remain with Great Aunt and closed the dependency and neglect case.

A subsequent non-custodial permanency plan appears in the record developed in June 2017. This plan required Mother to complete an alcohol and drug assessment and follow recommendations; complete a mental health assessment and follow recommendations; comply with random drug screens and hair follicle drug tests; maintain appropriate housing, employment, and transportation; and continue with counseling and aftercare.

Following the Juvenile Court action, Great Aunt married Quentin B. ("Great Uncle"). Mother had filed two petitions in Juvenile Court seeking to regain custody of the Child. One was denied after Mother was not present for the hearing. The second petition was not adjudicated due to the filing of this termination action.[1] In April 2018, Petitioners filed their petition for adoption and termination of Mother's parental rights to the Child in the Meigs County Circuit Court ("Trial Court"). The termination petition requested termination of Mother's parental rights on the statutory grounds of persistent conditions, severe child abuse, abandonment by failure to visit, abandonment by failure to support, and failure to manifest an ability and willingness to assume custody of the Child. They subsequently filed an amended petition in August 2018, which included the same grounds as to Mother as in the original petition.

The Trial Court conducted a trial in February 2019. In its June 2019 order, the Trial Court determined that Petitioners had proven by clear and convincing evidence the grounds of severe child abuse and abandonment by failure to financially support the Child. However, the Trial Court found that termination of Mother's parental rights was not in the Child's best interest. Concerning its best interest analysis, the Trial Court found as follows:

> While the testimony as to the family background and "grounds" for termination was of some length, the testimony as to the best interest prong was not, although certainly a fair amount of the testimony overlaps into both considerations. Some of the testimony as to the jobs and incomes of the parties is certainly of import as to best interests analysis. By way of additional proof on the issue, the Petitioners basically took the position that continuing to reside in their home would ensure that the child has a stable environment. Both Petitioners testified that the child was doing well, is well adjusted and cared for and is being taught right from wrong. This court has no reason to doubt the Petitioners in this regard. The Petitioners testified that they are also worried about [Mother] relapsing into drug use.[2]

---

[1] The record is unclear whether the second custody petition was not adjudicated and remained pending or whether the petition was dismissed for lack of jurisdiction due to the filing of the termination action. The Juvenile Court's order is not included in the record on appeal.

[2] The concern about a relapse for recovering addicts is a very real concern and one this court shares. However, based upon the steps/actions [Mother] has taken since removal, this court is of the opinion that [Mother] has addressed her addiction and has, for the time being, overcome the addiction. There exists no guarantees that [Mother] will remain clean and maintain her sobriety. This court is not returning the child to [Mother]. The only issue before this court is whether to terminate [Mother's] parental rights. The Order of the McMinn County Juvenile Court as to temporary custody remains in effect. To seek return of her child to her custody, [Mother] must file the appropriate petition in that court.

In addition to her other testimony set out herein, [Mother] countered by arguing that this court should preserve the family unit that is essential to physical and psychological well-being of children, in addition to the testimony set out above.

* * *

This court will review each of [the best interest] factors individually.

Subsection (i)(1) mandates this court to consider "[w]hether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian." As should be apparent from this court's findings of fact and conclusions thus far, this court finds that [Mother] has made such adjustment(s) to make her home safe and in the child's best interests. She has admitted her past mistakes, most importantly to herself, has successfully completed drug rehabilitation, has obtained suitable employment, transportation and housing and went back to school and obtained her [C.N.A.] certification. Additionally, the proof was clear at trial that [Mother] was no longer associating with the type of people she was at the time of conception of this child as well as during and immediately after her birth.[3]

The second statutory consideration is that of "[w]hether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible." Tenn. Code Ann. § 36-1-113(i)(2). Other than the creation of the Non-Custodial Family Parenting Plan, based upon the proof introduced at trial, this court is unsure what efforts were made by "available social services agenc[ies]" to effect lasting adjustments. However, as noted above, [Mother] made the efforts herself. From the proof, the entire reason for removal of the child in the first place was that of [Mother's] drug use and its sequelae. Per the only proof before the court on the issue, [Mother] testified that she has been "sober" since shortly after the birth of the child and has attended drug counseling and treatment. When determining whether a "lasting adjustment" is made, the best a court can do is to evaluate any change from the time of the

---

[3] The court would note that while it is not terminating the parental rights of the mother, it is also not returning the child to its mother. The McMinn County Juvenile Court removed the child from the mother on a temporary basis and retains jurisdiction for that purpose. Therefore, if the mother wishes to have the child returned to her, she will have to take the proper steps in McMinn County Juvenile Court.

- 4 -

occurrence of the conduct to the present. Together with [Mother's] successful efforts as to achieving and maintaining her sobriety, [Mother] has, as noted above, gone back to school and gotten her [C.N.A.] certification, acquired suitable housing and transportation and has made what appears to the court to have been a significant change in lots, if not all, aspects of her life. When evaluating the change in her life from the date of the child's birth to the present, this court finds that [Mother] has made the requisite "lasting adjustment," at least to date.

The court's conclusion as to the third statutory consideration, that of maintaining regular visitation or other conduct with the children, are the same as its conclusions as to the alleged ground of termination of abandonment-failure to visit. While recognizing that there may be some "daylight" between a ground for termination, i.e., abandonment-failure to visit, and best interest consideration of "maintaining regular visitation or other conduct with the children," the court here finds that the analysis set out above as to termination of abandonment for failure to visit is applicable here. Therefore, the court does not find that the Petitioners have carried their burden as to this consideration.[4]

---

[4] Concerning the ground of abandonment by failure to visit, the Trial Court found as follows:

As to the ground of abandonment-failure to visit, the proof was clear that [Mother] exercises her twice weekly supervised visitation. The Petitioners argue that such visitation is perfunctory in nature and that [Mother] sleeps while at the visits. It was clear to the court that to the extent a relationship exists between [Mother] and [Great Aunt], it is, at best a strained one. [Mother's] visitation with her child was supervised by her grandmother and not by the Petitioners, who were not present for any of the visitation. While there exists no question that [Mother] exercised the visitation made available to her, as noted above, some questions exist as to the quality of that visitation. Of note, the grandmother did not testify, although the Petitioners introduced the hearsay statements of the grandmother as to the "sleeping" issue without objection. However, [Mother] denied the allegations as to the perfunctory nature of the visits and testified that she exercised all of the visitation that she was permitted and that she was attentive during the visitation. As to credibility, this court finds [Mother] to have been a credible witness at trial. The basis for this finding is comprised of several observations by the court. First, [Mother] did not deny or minimize her past drug use and past mistakes. Rather, she was candid about her drug use and how long it had lasted. She did not evade questions, even those questions for which the answers were not helpful to her position. Additionally, the court observed her demeanor as she testified. She did not appear to the court to be angry or disrespectful toward Petitioners' counsel and appeared to be genuinely sorry for her past actions and their impact on others. Therefore, this court finds the testimony of [Mother] as to the visits with the child to be more probative than that of the hearsay declarations of the grandmother and finds that the Petitioners have not proven by clear and convincing evidence the ground of abandonment for failure to visit as contemplated by Tenn. Code Ann. 36-1-113(g)(1).

Next, Tenn. Code Ann. § 36-1-113(i)(4) instructs the court to determine "[w]hether a meaningful relationship has otherwise been established between the parent or guardian and the child." As should be obvious from the discussion above as to visitation, it is difficult for this court to state whether a meaningful relationship exists or not. [Mother] was obviously limited in her opportunities to visit and has therefore been limited in her ability to establish a meaningful relationship. [Mother] exercised what visitation was offered and the court has already found that the above "third factor" mitigates in favor of [Mother]. However, the proof at trial was not sufficient for this court to state whether such a relationship exists. However, this court will state that based upon the limited visitation permitted, the establishment of a meaningful relationship would have been difficult.[5]

However, [Mother] is the natural parent of the child, whereas the Petitioners are the great aunt and uncle and legal custodians and [Mother] has complied with the non-custodial permanent parenting plan. This court has serious and grave concerns as to terminating the parental rights of a parent who has largely or totally complied with the terms of a non-custodial permanent parenting plan to which she, [Great Aunt] and DCS agreed to. Not only does termination under such circumstance strike this court as being fundamentally unfair to the parent, this court has serious and grave concerns as to how such a ruling would impact the efforts of DCS. If termination of parental rights can occur despite the parents' compliance with an agreed to non-custodial permanent parenting plan, what good are such plans? Further, termination under such circumstances would hamstring the efforts of DCS and render such agreements to be no more than a sham agreement which need not be honored or complied with. This court is unwilling to take such a position in light of sufficient facts demonstrating substantial compliance with the agreed to non-custodial permanent parenting plan.

That having been said, this court has no question that the Petitioners have provided the children at issue herein with a loving and safe home. This court also has no question that the child has prospered in the Petitioners' home and that the Petitioners, and their children, have become

---

[5] As noted above, this court can only decide whether the termination of parental rights is appropriate or not appropriate based upon the proof at trial. The decision as to the return of the child from the "temporary custody" of the Petitioners to [Mother] will have to be made by the McMinn County Juvenile Court.

extremely attached to each other. However, the court finds that the Petitioners have not carried their burden as to this statutory consideration.

Next, courts are instructed to consider "[t]he effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition." Tenn. Code Ann. § 36-1-113(i)(5). No expert proof was introduced on this issue. Indeed, there was scant proof on the issue from the parties. What is clear to this court from the proof is that the child has been with the Petitioners from the time she left the hospital until the date of the Order.[6] This court has no doubt that this child has bonded with its temporary custodians and has a much greater bond with them than she does her mother. This court would be less than candid if it did not acknowledge that it was concerned about a change being detrimental to her emotional and psychological wellbeing. Yet, this court also recognizes the importance of the natural parent and child relationship and that termination of the relationship could also be detrimental to the child's long term emotional and psychological wellbeing. Therefore, while acknowledging that the proof on this issue preponderates in favor of the Petitioners, it does not rise to the level of clear and convincing proof.

As previously discussed, based upon the proof presented at trial, the court finds that [Mother's] prenatal, perinatal and post-natal drug use to meet the requirements of the sixth (6th) statutory factor, set out at Tenn. Code Ann. § 36-1-113(i)(6).

As to the seventh (7th) factor, set out at Tenn. Code Ann. § 36-1-113(i)(7), the proof was that [Mother] has obtained suitable, healthy and safe housing. The guardian *ad litem* reported that he had visited both the homes of the Petitioners and [Mother] and found both to be suitable in terms of housing. Once again, the testimony of the mother and the report of the guardian *ad litem* established that [Mother's] home was suitable, safe and healthy. The Petitioners submitted no proof to the contrary. The Petitioners did establish that a man, perhaps a one-time or on and off boyfriend of [Mother] had resided in the home for a period of time after the birth of the child. There was some indication from the proof that this "boyfriend" may have been involved in the use of illicit drugs. [Mother] testified that this "boyfriend" was in [Mother's] home for a short period of time after she obtained the residence. However, she testified that he had

---

[6] As noted above, the child will continue to reside with the Petitioners until further Order of the McMinn County Juvenile Court.

not resided or visited there in quite some time. Therefore, the court finds that the proof on this factor mitigates in favor of [Mother].[7]

As to the eighth factor, set out in Tenn. Code Ann. § 36-1-113(i)(8), no specific proof was introduced as to the mental and/or emotional status of any of the parties herein. With that said, the court did observe the parties during the course of the trial and, in that short time frame, observed nothing of concern in that regard.

As to the ninth (9th) and final consideration set out in Tenn. Code Ann. § 36-1-113(i)(9), the court finds the proof to be clear and convincing that [Mother] has failed to pay child support for her child since her birth.

As noted above, as to the actual terms of the Non-Custodial Family Parenting Plan, the court finds them to be of significance in respect to its "best interest" analysis and decision. The parties herein and DCS were signatories on the Plan. Here the proof in this case was clear to the court that [Mother] complied with most of the above plan of action, and exceeded some of the requirements.[8] Since the removal of her child, [Mother] attended community college and obtained her [certified nursing assistant] certificate. As a result, at the time of trial she had found stable employment. This led to the acquisition of appropriate housing and transportation.[9] She testified that . . . while she was no longer in alcohol/drug aftercare, she had successfully completed a program and that she remains sober. Additionally, [Mother] submitted evidence that she had completed a parenting course as well. All of the above has led to [Mother] meeting the "desired outcome" of the Non-Custodial Family Parenting Plan, namely, that she "complete all requirements, follow through with all recommendations, provide evidence that she will be able to provide a safe, stable, drug free environment."

---

[7] Once again, the presence or lack thereof of others in [Mother's] home may become an issue in any subsequent proceedings in the McMinn County Juvenile Court.

[8] No documentary proof was entered as to the Alcohol and Drug Assessment and completion of the hair follicle test. However, the court would note that [Mother] is employed in the health care field as a [certified nursing assistant] and, per her testimony, was required to submit to pre-employment drug testing.

[9] [Mother] testified that she had obtained suitable housing and transportation. This fact was confirmed by the report of the guardian *ad litem*.

This court is of the opinion that terminating the parental rights of a parent who has met or exceeded the requirements placed upon her by a Juvenile Court and DCS would not only be fundamentally unfair, but would also set an extremely bad precedent. Such a precedent would not only render the efforts of DCS to effectuate real and positive change on the part of parents, it would render Agreed Family Parenting plans useless. If courts could proceed to terminate parental rights where parents had complied with such plans, then why bother with the plans in the first place.

In this case, we have a mother who had been involved with drugs for a long time and her involvement finally caught up with her, and her newborn child. As a result, [Mother] put her child at risk and her parental rights at risk. As stated above, if the story ended here, the court would terminate [Mother's] parental rights. However, [Mother] has taken the right steps, at least to date and has become, albeit belatedly, a productive member of society.

The question becomes whether she should be stripped of her right to be a parent based upon her previous "sins." This court thinks not. There are certainly previous "sins" that, in and of themselves, are enough to justify termination of parental rights. In particular the court is referencing certain sex and physical abuse crimes where the child is the victim. That is not the case here. Like the Petitioners, this court is concerned with the possibility of [Mother] relapsing into drug use and the effect that would have on her as well as this child. But, parental rights are not terminated based upon what might happen in the future. To terminate the parental rights of a parent who has obviously erred and been punished, but then who has done everything asked of them is not a position this court will take. Doing so could very well remove the primary incentive for people such as [Mother] to take the steps she has taken and become a productive member of society.

Therefore, this court is convinced that the reuniting of parent and child is the appropriate choice here. The court is also convinced that the Petitioners have provided the child with a safe and stable home and, had [Mother] not taken the steps she did, would have certainly been suitable adoptive parents. However, the court is constrained to point out that the proof before it was that the placement of the child was a voluntary placement, agreed to by [Mother] with the above conditions being required to have been met prior to return of the child.

In sum, this court has no question that the Petitioners have provided the child at issue herein with a loving and safe home. This court also has no question that this child has prospered in the Petitioners' home and that the Petitioners, and their children, have become extremely attached to the child. Given the epidemic of drug abuse in our country, and specifically the prevalence of babies being born addicted to drugs, people willing to step up and serve as custodians of these babies are of utmost importance in our society and should not just be thanked, they should be applauded. However, these people are temporary custodians of the child. While they may later seek to become the adoptive parents of the child, as the petitioners here have, they are not the child's parent or parents during the period of time they are serving as custodians. While it is fairly common that the temporary custodians later become the legal parents of the child through adoption, such is usually the case when the natural parents fail to confront, address and remedy the issues that resulted in their children being removed from their custody and placed with the temporary custodians. Unfortunately, this court has seen enough of these cases to know that more often than not, the natural parents fail to take the necessary steps and the temporary custodians become the adoptive parents.

(Footnotes in original but renumbered) (other internal citations omitted). Petitioners timely appealed to this Court.

**Discussion**

Although not stated exactly as such, Petitioners raises the following issue for our review: whether the Trial Court erred by finding that Petitioners had not established by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Child.

With regard to the termination of parental rights, our Supreme Court has instructed:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[10] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed.2d 49 (2000);

---

[10] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

*Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L. Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S. Ct. 1388. ["]Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S. Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 136 L. Ed.2d 473 (1996). The parental rights at stake are ["]far more precious than any property right." *Santosky*, 455 U.S. at 758-59 102 S. Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759, 102 S. Ct. 1388 (recognizing that a decision terminating parental rights is ["]*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to ["]fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S. Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated ["]fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S. Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). ["]Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than

not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1[-]113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[11] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[12] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best

---

[11] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[12] Tenn. Code Ann. § 36-1-113(i).

interests of the child." Tenn. Code Ann. § 36-1113[sic](k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

Additionally, the Trial Court is the arbiter of witness credibility of those who testify live before it.  As our Supreme Court has instructed:

> When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony.  *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997) (quoting *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996)).  Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary.  *Wells v. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

*Hughes v. Metro. Gov't of Nashville and Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011).

Although the parties have not raised grounds as an issue on appeal, our Supreme Court has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal."  *In re Carrington H.*, 483 S.W.3d 507, 525-26 (footnote omitted).

First, we will address the statutory ground of severe child abuse.  As this Court has previously stated:

> Tennessee Courts have determined that parents can be held to answer for prenatal conduct that causes severe abuse to later-born child.  In *In re M.J.J.*, No. M2004-02759-COA-R3-PT, 2005 WL 873305 (Tenn. Ct. App. Apr.14, 2005), a pregnant mother gave birth to a child who, like herself, tested positive at birth for methamphetamines and opiates.  The child was born with tremors, but otherwise developed normally.  Despite the fact that the child developed well, the court notes that "the healthy development of the child in this case does not diminish the severity of the harm to which the child was exposed."  *Id.* at *8.  This Court affirmed the trial court's finding that, "by taking this illegal controlled substance [of methamphetamines], Mother had exposed [the child] to a substantial risk of great bodily injury."  *Id.*  The court concluded that "the record clearly

- 14 -

supports the trial court's finding that Mother's prenatal drug use constituted severe child abuse for purposes of parental rights termination."

*Cornelius v. State, Dep't of Children's Servs.*, 314 S.W.3d 902, 910 (Tenn. Ct. App. 2009).

During the adjudicatory hearing in the Juvenile Court proceedings, Mother stipulated to the facts in the dependency and neglect petition against her, which included Mother's failed drug tests during her pregnancy, her drug use at the hospital while breastfeeding, the Child's withdrawal symptoms following birth, and the Child's diagnosis of Neonatal Abstinence Syndrome. Mother acknowledged during the termination trial that she had waived the adjudicatory hearing and had agreed during the dependency and neglect action that the facts in the dependency and neglect petition were true. Mother again acknowledged at the termination trial that the facts in that petition were true. The dependency and neglect petition and the adjudicatory hearing order were admitted as exhibits in the termination trial. Despite her stipulation to the facts in the dependency and neglect petition, Mother denied using methamphetamine throughout her entire pregnancy and stated that she stopped before her first doctor's appointment but that it was still in her system. Mother further testified at trial that she used illegal drugs following the Child's birth while breastfeeding the Child. The evidence does not preponderate against any of the Trial Court's findings relevant to this ground. We find and hold, as did the Trial Court, that Petitioners have proven the ground of severe child abuse by clear and convincing evidence.

We next address the ground of abandonment by failure to visit. Petitioners filed an original and an amended petition in this matter. Both petitions contained the same grounds against Mother, including abandonment by failure to support the Child. As such, the correct four-month period would be immediately prior to the original petition. *See In re Ava M.*, No. E2019-01675-COA-R3-PT, slip op. at 21-23 (Tenn. Ct. App. May 20, 2020); *In re P.G.*, No. M2017-02291-COA-R3-PT, 2018 WL 3954327, at *7 (Tenn. Ct. App. Aug. 17, 2018), *no appl. perm. appeal filed*. We note that the original petition was filed in April 2018 and that the relevant statute in effect at that time concerning abandonment stated as follows in pertinent part:

For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the

- 15 -

parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A) (2017). The version of Tennessee Code Annotated § 36-1-102(1)(A)(i) in effect in April 2018 required that a parent's failure to support be willful. This Court has held that "'[f]ailure to support a child is 'willful' when a person is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing the support.'" *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005).

Concerning this statutory ground, the Trial Court found that the proof presented was "clear that [Mother's] efforts in this regard fall short of what is expected under the law." The Trial Court acknowledged that there was no order requiring Mother to pay support and that there was no request for support from Petitioners and correctly determined that the lack of such an order does not prevent the Court from finding this ground. The absence of a court order requiring a parent to pay child support does not negate that parent's obligation to pay support. *See In re M.A.C.*, No. M2007-01981-COA-R3-PT, 2008 WL 2787763, at *5 (Tenn. Ct. App. July 17, 2008) ("Though Mother was not under a court order setting support for her children, such an order is not required."). However, the Trial Court failed to make findings of fact identifying the relevant four-month period. Even assuming the Trial Court's findings encompassed the four-month period, the Trial Court also failed to make findings of fact concerning Mother's willfulness in not paying support. Under the statute in effect when the petition was filed, Petitioners had the burden of showing Mother's willfulness. As such, we reverse this ground for termination of Mother's parental rights.

Because the Trial Court did not find that clear and convincing evidence existed to terminate Mother's parental rights on the grounds of abandonment by failure to visit, persistent conditions, and failure to manifest an ability and willingness to assume custody of the Child and no party has raised those grounds as an issue, we are not required by *In re Carrington* to address them. *See In re Carrington H.*, 2016 WL 819593, at *13 (instructing this Court to "review the trial court's findings as to each ground for termination" and the best interest analysis).

Next, we will address Petitioners' argument of whether the Trial Court erred by determining that termination of Mother's parental rights was not in the Child's best interest. Tennessee Code Annotated § 36-1-113(i) provides a set of non-exclusive factors courts are to consider in determining whether termination of parental rights is in a child's best interest:

(i)  In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following

(1)  Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)  Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)  Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)  Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)  The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)  Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)  Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)  Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent
        with the child support guidelines promulgated by the department
        pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2019).

With regard to making a determination concerning a child's best interest, our Supreme Court has instructed:

> When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H*., 483 S.W.3d at 523 (citing *In re Audrey S*., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S*., 455 S.W.3d at 555 (citing *In re Audrey S*., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id*. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S*., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).
>
> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S*., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S*., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H*., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular

- 18 -

consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

The Trial Court considered the factors in Tennessee Code Annotated § 36-1-113(i) in making its decision. Pursuant to factors (1) and (2), the Trial Court found that Mother had made an adjustment to her circumstances that had made her home safe and in the Child's best interest. The Trial Court found that Mother had admitted her past mistakes, completed drug treatment, obtained her C.N.A. certification, and obtained suitable employment, transportation, and housing.[13] The Trial Court further found that Mother was no longer associating with inappropriate people as she had been when the Child was removed from her custody. The Trial Court found that according to the proof presented at trial, Mother had been sober since shortly after the Child's birth. Petitioners did not present evidence that demonstrated ongoing drug use by Mother after the Child was removed from Mother. As such, the Trial Court found that Mother had, at the time of trial, made a lasting adjustment in her circumstances.

Concerning factor (3), the Trial Court found that this factor weighed in favor of Mother and that Mother had exercised her visitation twice a week. Although Petitioners argued that the visitation was perfunctory in nature and that Mother had slept at these visits, the Trial Court found the hearsay evidence presented by Petitioners to be less credible than Mother's testimony concerning visitation. Pursuant to factor (4), the Trial Court found that Mother had limited ability to visit the Child and that she had limited ability to develop a relationship with the Child. Therefore, the Trial Court found that the evidence presented "was not sufficient for this court to state whether such a relationship exists" between Mother and the Child.

As to factor (5), the Trial Court recognized that the Child had been in Great Aunt's custody since the Child left the hospital following her birth and that the Child had bonded with Petitioners. The Trial Court acknowledged that the Child had "a much greater bond with [Petitioners] than she does with [Mother]." Although acknowledging this bond and the concern that such a change in caretakers would have a detrimental effect on the

---

[13] The Trial Court found that Mother had obtained her L.P.N. certification but the evidence before the Court demonstrated that Mother actually obtained her C.N.A. certification.

Child's emotional and psychological wellbeing, the Trial Court recognized the importance of the Child's relationship with her biological parent and that termination of that relationship also could be detrimental to the Child's long-term emotional and psychological wellbeing.

Concerning factor (6), the Trial Court found that Petitioners had presented evidence sufficient to prove that Mother's "prenatal, perinatal and post-natal drug use" had satisfied this factor as to whether Mother had "shown brutality, physical, sexual, emotional or psychological abuse or neglect toward the child." The Trial Court found as to factor (7) that Mother had obtained a suitable, healthy, and safe home and that Petitioners had not submitted proof to the contrary. Concerning factor (8), the Trial Court found that no specific proof was presented concerning the parties' mental or emotional state. As relevant to factor (9), the Trial Court found that Mother had not financially supported the Child since her birth.

The evidence presented does not preponderate against the Trial Court's findings of fact concerning best interest. However, in its best interest analysis, the Trial Court seemed to place great emphasis on its concern with terminating the parental rights of a parent who has "largely or totally complied" with the requirements of a permanency plan. The Trial Court stated as follows:

> Not only does termination under such circumstance strike this court as being fundamentally unfair to the parent, this court has serious and grave concerns as to how such a ruling would impact the efforts of DCS. If termination of parental rights can occur despite the parents' compliance with an agreed to non-custodial permanent parenting plan, what good are such plans? Further, termination under such circumstances would hamstring the efforts of DCS and render such agreements to be no more than a sham agreement which need not be honored or complied with. This court is unwilling to take such a position in light of sufficient facts demonstrating substantial compliance with the agreed to non-custodial permanent parenting plan.

The best interest analysis is to be conducted according to the child's best interest, not the parent's. *See In re Gabriella D.*, 531 S.W.3d at 681. While relevant, a parent's compliance with the requirements on a permanency plan is not the sole determinative factor when making a decision in a termination of parental rights case. Instead, the parent's efforts are one of many factors to be considered by a trial court when making its decision concerning best interest.

Based on the evidence presented to the Trial Court and as found by the Trial Court, Mother has made significant progress in turning her life around. We note the high

standard of clear and convincing evidence applicable to termination of parental rights cases. "'Clear and convincing evidence' is 'evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Despite the Trial Court's apparent emphasis on Mother's progress on the requirements of the permanency plan, we find and hold, as did the Trial Court, that the entirety of the proof presented did not rise to the level of clear and convincing evidence that termination of Mother's rights was in the Child's best interest. We find no reversible error in the Trial Court's decision not to terminate Mother's parental rights.

## Conclusion

The judgment of the Trial Court is affirmed as modified, and this cause is remanded to the Trial Court for collection of the costs assessed below. The costs on appeal are assessed against the appellants, Lacy B. and Quentin B., and their surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE